# United States Tax Court

T.C. Memo. 2022-94

ALAN BRIAN FABIAN,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent

—————

Docket No. 25589-14.                    Filed September 13, 2022.

—————

P was the sole shareholder of C. C purported to engage in sale-and-leaseback transactions in which it would purchase computer equipment and software (together, equipment), sell the equipment to a third party, lease it back from that party, and make lease payments in return. The third party did not take possession of the equipment that it had agreed to purchase from C, and C did not purchase much of the equipment it purported to sell to the third party. C made "lulling payments" from the lease payments received from the third party. P caused C to pay out a portion of those receipts to entities in which P had an ownership interest or otherwise controlled as well as to personal bank and brokerage accounts of P's. The issues we must address include (1) P's objection to the testimony of one of R's witnesses on the grounds that her testimony improperly discloses a grand jury matter; (2) whether the periods of limitation on assessment and collection have expired; (3) whether P received constructive distributions on account of transfers from C to the various entities and to him, (4) whether those constructive distributions constituted "dividends" within the meaning of I.R.C. § 316(a), (5) whether P is liable for I.R.C. § 6663(a) fraud penalties for the years at issue, and (6) whether P is liable for I.R.C. § 6651(a)(1) additions to tax for two of the years at issue.

**Served 09/13/22**

**[\*2]** *Held*: R's witness's testimony does not improperly disclose a grand jury matter.

*Held, further*, because R has shown false or fraudulent returns with intent to evade tax, the period of limitations has not run for any of the years at issue.

*Held, further*, because of P's control over C, C's payments for his benefit were constructive distributions to him.

*Held, further*, because P has failed to show that C lacked sufficient earnings and profits, the constructive distributions constituted dividends within the meaning of I.R.C. § 316(a).

*Held, further*, P is liable for I.R.C. § 6663(a) fraud penalties for the years at issue.

*Held, further*, P is liable for I.R.C. § 6651(a)(1) additions to tax for two of the years at issue.

_____

Alan Brian Fabian, pro se.

*Elizabeth C. Mourges*, *Elizabeth M. Shaner*, *Victoria E. Cvek*, and *Michael A. Raiken*, for respondent.

**[*3]**     MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, *Judge*:     Respondent determined deficiencies, penalties, and additions to tax in Alan Fabian's (petitioner's) and Jacqueline Richards-Fabian's[1] federal income tax as follows:[2]

|  |  | Penalties and Additions to Tax | |
| --- | --- | --- | --- |
| Year | Deficiency | § 6663(a) | § 6651(a)(1) |
| 2002 | -0- | $22,075 | -0- |
| 2003 | $1,307,849 | 1,004,909 | $327,943 |
| 2004 | 1,192,974 | 1,250,992 | 417,403 |

Petitioner assigned error to respondent's determinations. The parties have stipulated certain issues. The issues remaining for decision are (1) petitioner's objection to the testimony of one of respondent's witnesses on the grounds that her testimony improperly discloses a grand jury matter; (2) whether the periods of limitations on assessment and collection have expired; (3) for 2003, whether petitioner failed to report income of $3,623,964 on account of transfers from Strategic Partners International, Inc. (SPI, Inc.), to Ocean Quest LLC (Ocean Quest), to Centre for Management and Technology, Inc. (CMAT), and to petitioner's personal accounts or otherwise for his benefit;[3] (4) for 2004,

---

[1] Mrs. Richards-Fabian filed a separate petition at docket No. 25261-14. On September 18, 2017, the parties in that case filed a stipulation of settled issues in which Mrs. Richards-Fabian was granted full relief from liability under section 6015(b) for each of the years at issue. That case remains open pending a final decision in this case.

[2] Unless otherwise indicated, all statutory references are to the Internal Revenue Code, Title 26 U.S.C., in effect at all relevant times, all regulation references are to the Code of Federal Regulations, Title 26 (Treas. Reg.), in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practice and Procedure. All dollar amounts have been rounded to the nearest dollar.

[3] In an explanation attached to his statutory notice of deficiency (notice) for the years at issue, respondent presented the following computation of petitioner's unreported income for 2003.

| Transfers from SPI, Inc., to Ocean Quest | $538,458 |
| --- | --- |
| Transfers from SPI, Inc., to CMAT, et al. | 1,931,664 |

[*4] whether petitioner failed to report income of $5,126,382 on account of transfers from SPI, Inc., to Ocean Quest, to CMAT, to CMAT International, Inc. (CMATI), to Competitive Innovations, LLC (CI, LLC), and to petitioner's personal accounts or otherwise for his benefit;[4] (5) whether petitioner is liable for fraud penalties under section 6663(a) for the years at issue, and (6) whether petitioner is liable for additions to tax under section 6651(a)(1) for 2003 and 2004.

Petitioner bears the burden of proof, *see* Rule 142(a), except that, with respect to the issue of fraud with intent to evade tax, the burden is

| | |
|---|---|
| Transfers from SPI, Inc., to petitioner's personal accounts | 1,613,842 |
| **Total** | **$4,083,964** |

In his Opening Brief, respondent includes a similar table in support of a proposed finding of fact (PFF No. 409) that, for 2003, petitioner failed to report income in the amounts shown, and from the sources shown. That table differs from the table attached to the notice in that the third row of the second column shows $1,593,842 transferred from SPI, Inc., to petitioner's personal accounts. Respondent directs us to Exhibit 38-J, at 2, for that amount, but that Exhibit shows only $1,173,842 as transferred from SPI, Inc., to petitioner's personal accounts. Subsequently, respondent proposes that we find that, in 2003, petitioner transferred $1,153,842 from SPI, Inc., to his personal accounts. *See* PFFs Nos. 414 and 420. We will accept that last amount as respondent's proposal, so that, in total, respondent is proposing that, for 2003, petitioner failed to report income of $3,623,964, comprising the following:

| | |
|---|---|
| Transfers from SPI, Inc., to Ocean Quest | $538,458 |
| Transfers from SPI, Inc., to CMAT, et al. | 1,931,664 |
| Transfers from SPI, Inc., to petitioner's personal accounts | 1,153,842 |
| **Total** | **$3,623,964** |

[4] Consistent with the notice, respondent proposes that, for 2004, we find petitioner failed to report income of $5,126,382, comprising of the following:

| | |
|---|---|
| Transfers from SPI, Inc., to Ocean Quest | $35,000 |
| Transfers from SPI, Inc., to CMAT, et al. | 3,938,698 |
| Transfers from SPI, Inc., to petitioner's personal accounts | 1,152,684 |
| **Total** | **$5,126,382** |

**[\*5]** on respondent, which he must carry by clear and convincing evidence, *see* § 7454(a); Rule 142(b).

## FINDINGS OF FACT

The parties have stipulated certain facts and certain documents. The facts stipulated are so found, and documents stipulated are accepted as authentic.

### Petitioner

Petitioner resided in Maryland when he filed the petition.

In 1986, petitioner graduated summa cum laude from Shippensburg University with a degree in accounting. Following college, petitioner went to work for Arthur Andersen, where he remained until sometime in 1991 and where, among other assignments, he prepared tax returns and performed audits and consulting work for closely held companies. He was licensed as a Certified Public Accountant in the State of Maryland from 1994–2006.

### Fabian Bank and Brokerage Accounts

During the years at issue, the Fabians had a bank account with Mercantile Safe Deposit & Trust Co. (MSDT) (Fabian bank account).

During the years at issue, the Fabians had a brokerage account with Charles Schwab (Fabian brokerage account).

### SPI LLC

In 1998, petitioner and a business partner formed a Nevada limited liability company, Strategic Partners International LLC (SPI LLC), with petitioner as the managing member. SPI LLC specialized in information technology and activity-based costing and consulting services. In July 2000, petitioner and his business partner sold SPI LLC to Maximus, Inc. (Maximus), a publicly traded government consulting company. Petitioner became an employee of Maximus with the title "Division Vice President." SPI LLC remained a subsidiary of Maximus until September 2001, when Maximus merged SPI LLC into itself and out of existence.

**[\*6]** *SPI, Inc.*

In March 2002, petitioner organized SPI, Inc. He did not inform Maximus that he had organized SPI, Inc., and Maximus had no ownership interest in it. Petitioner was SPI, Inc.'s sole shareholder. SPI, Inc., had no internal financial controls, and petitioner controlled its money, accounting, and books and records. SPI, Inc., had two bank accounts at MSDT, with account numbers ending in 2028 and 9538 (SPI, Inc. bank accounts Nos. 2028 and 9538). Petitioner was the only individual with signature authority over the accounts.

For 2002, SPI, Inc., filed a Form 1120–A, U.S. Corporation Short-Form Income Tax Return. It reported gross receipts of $6,736,624, no cost of goods sold, and taxable income of $206,186 after deducting approximately $4.5 million for rent and close to $2 million of other expenses, mostly for travel and outside services. Its included balance sheet shows no loans to shareholders. It reported its business activity as "technical and assistance" and its product or service as "software and computers." The Internal Revenue Service (IRS) has no record of SPI, Inc.'s filing a 2003 Form 1120. SPI, Inc., filed a 2004 Form 1120, U.S. Corporation Income Tax Return, signed by SPI, Inc.'s bankruptcy trustee. *See infra* p. 8. That return reports neither receipts nor expenses. It reports loans to shareholders of $450,241.

*Maximus*

Petitioner managed his own independent group within the Maximus structure. The group maintained its own office in Greenbelt and, later, Columbia, Maryland. Although Maximus's main office was nearby, in Reston, Virginia, petitioner reported to officers of Maximus in Northbrook, Illinois, who visited his group's office only two to three times a year. Maximus executives did not have knowledge of the daily operations of petitioner's group.

*Sale-and-Leaseback Transactions*

Sometime before SPI LLC's merger into Maximus, SPI LLC began to engage in transactions involving the sale and leaseback of computer equipment and software. The transactions were facilitated by a leasing broker, Solarcom, Inc. (Solarcom). In form, the transactions were to work as follows. SPI LLC specified the computer equipment and software that was to be the subject of each sale-and-leaseback transaction. Solarcom then found third-party funding sources for the

[*7] transactions. Using the funds obtained from those sources, Solarcom purchased the specified computer equipment and software from SPI LLC and immediately leased it back to it without ever taking physical possession. SPI LLC was obligated under its leases with Solarcom to pay it three months' rent, with subsequent lease payments going to the funding sources.

Following the demise of SPI LLC, SPI, Inc., carried on the sale-and-leaseback activity that SPI LLC had begun (SPI LLC and SPI, Inc., together, the entities). Between approximately March 2001 and June 2004, Solarcom paid the entities approximately $32 million to purchase computer equipment and software. The payments were deposited into the entities' bank accounts, over which petitioner had sole signature authority. During that period, the entities made ostensible lease payments of $16.2 million ($3.3 million to Solarcom and $12.9 million to the funding sources).

Things, however, were not as they appeared. With respect to most of the transactions that took place between March 2001 and the fall of 2003, the entities did not purchase the computer hardware that they purported to sell to Solarcom. Beginning in the fall of 2003, petitioner caused SPI, Inc., to purchase computer hardware but provided Solarcom with fraudulent quotes and invoices to make it appear that the equipment purchased cost more than SPI, Inc., had actually paid. Petitioner also created fraudulent records of wire transfers that reflected wire transfers from SPI, Inc.'s accounts to the manufacturers of the purchased computer equipment.

Beginning in 2001 and continuing until early 2003, the entities, purported to sell to, and then lease back from, Solarcom computer software licenses that had been provided free to Maximus for use in consulting engagements. Petitioner further involved Maximus in SPI, Inc.'s fraudulent activities by representing that SPI, Inc., was a wholly owned subsidiary of it and purporting to obligate Maximus for payment of the leases in the event of the entities' default. Maximus was unaware that petitioner was purporting to obligate it, and, in fact, petitioner lacked authority to do so.

Because, for the most part, the entities had not purchased the computer equipment and software that they purported to sell to Solarcom, the lease payments the entities made to Solarcom and to the funding sources were merely "lulling payments," i.e., payments made to hide the fraudulent nature of the entities' activities.

[*8]   By July 2004, SPI, Inc.'s financial machinations began to unravel, and the company defaulted on 11 outstanding leases.

*SPI, Inc. Bankruptcy*

In August 2004, SPI, Inc., was forced into bankruptcy.  At the request of SPI, Inc.'s creditors, the U.S. Bankruptcy Court for the District of Maryland (Bankruptcy Court) appointed Zvi Guttman, an attorney, as trustee for SPI, Inc.  Mr. Guttman concluded that SPI, Inc., had received $32 million from the funding sources for equipment and software that, for the most part, it had not purchased and that it had returned approximately half of that sum to the funding sources as lulling payments.  Mr. Guttman sought to determine the disposition of the other half of the $32 million.  Presented with voluminous records with respect to SPI, Inc.'s activities, Mr. Guttman hired attorneys and a forensic accountant, Raymond Peroutka, to analyze SPI, Inc.'s bank and business records.

Mr. Guttman's team constructed a chart that traced the movement of money between SPI, Inc., and related parties (cashflow chart).  The cashflow chart identifies in a row at the top SPI, Inc.'s bank accounts along with bank accounts of other petitioner-related entities, as well as accounts in petitioner's name.  Columns on the left identify by date particular transactions, such as a deposit, a check written, or a wire transfer.  The body of the chart shows the amounts moving in, out, or through the accounts, and a column on the right shows the beneficiary or payee.  With the aid of the cashflow chart, Mr. Guttman was able to trace funds that went out of SPI, Inc.'s bank accounts and moved through and to petitioner's bank accounts and to bank accounts of other petitioner-controlled entities such as Ocean Quest and CMAT, or directly to private jet rental companies such Sentient Jet and Marquis Jet for private jet travel for petitioner and his family, and to the private school that petitioner's children attended.

Mr. Guttman determined that many transfers from SPI, Inc., served no business purpose and were fraudulent with respect to its creditors.  In particular, he determined that Ocean Quest had no business relationship with SPI, Inc. and that SPI, Inc., had no business purpose for sending money to Ocean Quest, which it never repaid to SPI, Inc.  He determined petitioner had used Ocean Quest to purchase beach houses in North Carolina.  Mr. Guttman also determined that transfers from SPI, Inc., to CMAT served no purposes related to the former's business and, although a small amount of the funds received from SPI,

[*9] Inc., was used to pay for computers for underprivileged children, most of the funds received from it ended up in petitioner's pocket or were otherwise used for his benefit.

In an attempt to recover the millions of dollars that petitioner had transferred out of SPI, Inc., Mr. Guttman brought 11 adversary proceedings against defendants including Ocean Quest, CMAT, the jet rental companies, petitioner, and Mrs. Richards-Fabian. Mr. Guttman's collection efforts were not particularly successful, producing only approximately $750,000 for SPI, Inc.'s creditors. His collection efforts stopped once SPI, Inc., had no remaining assets and petitioner had filed for personal bankruptcy late in 2008.

During SPI, Inc.'s bankruptcy proceeding, petitioner provided false testimony under oath. He filed a false Statement of Financial Affairs (SOFA) for SPI, Inc., with the Bankruptcy Court. He caused two software vendors to create backdated paperwork to give the appearance that certain software sales occurred earlier than the actual dates of sale.

*Other Relevant Entities*

*Special Properties*

Special Properties is an entity not owned by petitioner but with the same address as SPI, Inc. Special Properties had a bank account at MSDT with an account number ending in 2036 (Special Properties bank account). Petitioner had signature authority on the Special Properties bank account.

*Ocean Quest*

From 2000 through 2005, petitioner vacationed with his family in North Carolina, and, during that period, he and his wife purchased at least two beach houses there.

In 2003, he organized Ocean Quest, a Maryland limited liability company. He was both a member of Ocean Quest and managing director. Ocean Quest had a bank account at MSDT with an account number ending in 4808 (Ocean Quest bank account). Petitioner was the only individual with signature authority on the Ocean Quest bank account. During 2003, petitioner caused SPI, Inc., to transfer $538,458 from its bank account No. 2028 to the Ocean Quest bank account, and, during 2004, he caused SPI, Inc., to transfer $35,000 from its bank account No. 2028 to the Ocean Quest bank account. In November 2003,

[*10] Ocean Quest purchased two beachfront lots in Holden Beach, North Carolina. Petitioner signed the HUD-1 Settlement Statement for Ocean Quest as "Managing Member." In December 2003, Ocean Quest purchased another beachfront lot in Holden Beach. Petitioner again signed the HUD-1 Settlement Statement for Ocean Quest as "Managing Member." The SOFA recorded no payments from SPI, Inc., to Ocean Quest.

### CMAT

Petitioner organized CMAT, a Maryland nonstock corporation, in 2003. CMAT was an organization exempt from income tax under section 501(c)(3) of the Internal Revenue Code. Petitioner was a member of its board of directors and its chief executive officer (CEO). CMAT's ostensible purpose was to expose underprivileged children to technology by providing them with computers, software, and knowhow. CMAT had a bank account at MSDT, with an account number ending in 6031 (CMAT bank account), and petitioner had signature authority on the account.

### 2003

During 2003, petitioner caused $100,000 to be transferred from the Special Properties bank account to the CMAT bank account. He also caused $1,900,000 to be transferred from SPI, Inc. bank account No. 2028 to the CMAT bank account. In December 2003, CMAT paid $68,336 to Dell Computers for computers.

On various dates in 2003, CMAT transferred $446,000 to the Fabian bank account and $30,000 to Ocean Quest (in total, $476,000).

### 2004

On various dates beginning in January 2004 and continuing through October 2004, petitioner caused $3,735,000 to be transferred from SPI, Inc. bank account No. 2028 to the CMAT bank account.[5] Beginning in May 2004, petitioner caused CMAT to return to SPI, Inc., $71,000: $38,000 from the CMAT bank account to SPI, Inc. bank account No. 2028 and $33,000 from the CMAT bank account to SPI, Inc. bank account No. 9538. The net 2004 transfer from SPI, Inc., to CMAT

---

[5] Exhibit 37-J, on which respondent relies for his calculation of the transfers, apparently double counts a transfer of $70,000 on February 4, 2004. We will count the $70,000 transfer once.

**[\*11]** was $3,664,000 ($3,735,000 − 71,000 = $3,664,000). In February 2004, CMAT paid $80,946 to Dell Computers for computers.

On various dates in 2004, CMAT transferred $581,000 to the Fabian bank account. It also transferred $335,000 to an account for the construction of a swimming pool at petitioner's home (in total, transfers of $916,000).

*CMATI*

In 2004, CMAT's board of directors organized CMATI, a Maryland for-profit corporation that was wholly owned by CMAT. Petitioner was CEO of CMATI. CMATI had a bank account at MSDT, with an account number ending in 2746 (CMATI bank account), and petitioner had signature authority on the account. In March 2004, petitioner caused $26,000 to be transferred from SPI, Inc. bank account No. 2028 to the CMATI bank account.

*CI, LLC*

CI, LLC, is an entity not owned by petitioner. During 2003 and 2004, CI, LLC, had a bank account with Provident Bank with an account number ending in 0420 (CI, LLC bank account). In his plea agreement, discussed *infra* p. 16, petitioner describes his use of CI, LLC, between April 2005 and March 2007 as an instrumentality to create false sale invoices purportedly showing purchases by CMAT of computer equipment from CI, LLC. Petitioner used the false invoices to obtain loans to finance the ostensible purchases.

During 2004, petitioner caused $105,000 to be transferred from SPI, Inc. bank account No. 2028 to the CI, LLC bank account.

*American Patriot PAC*

American Patriot PAC is a political action committee that petitioner organized. It had a bank account at MSDT with an account number ending in 2541 (American Patriot PAC bank account).

*Ansbacher*

Ansbacher is a foreign bank located in the Caribbean. In February 2004, petitioner caused SPI, Inc., to transfer $25,000 from its bank account No. 2028 to Ansbacher. In October 2004, Ansbacher returned $20,000 to SPI, Inc. bank account No. 9538.

[*12]  *Unknown Entity*

In May 2004, SPI, Inc., received a $25,000 payment from an unknown entity (Unknown Entity).

*The Cambridge School*

From 2002 through 2004, petitioner's children attended a private school, the Cambridge School.  During 2003 and 2004, SPI, Inc., transferred $35,000 and $150,000, respectively, to the school.

*Personal Accounts; Payments of Expenses, 2003*

*Transfers to the Fabian Bank Account*

On various dates in 2003, petitioner caused SPI, Inc., to transfer sums totaling $676,644 from its bank account No. 2028 to the Fabian bank account.

On January 6 and July 25, 2003, petitioner caused Special Properties to transfer a total of $30,000 from its bank account to the Fabian bank account.

*Transfers to the Fabian Brokerage Account*

On April 25, 2003, petitioner caused SPI, Inc., to transfer $20,000 from its bank account No. 2028 to the Fabian brokerage account.

On July 25, 2003, petitioner caused Special Properties to transfer $20,000 from its bank account to the Fabian brokerage account.

*Private Jet Payments*

On February 21, 2003, petitioner caused SPI, Inc., to transfer $164,527 from its bank account No. 2028 to Marquis Jet.  In SPI, Inc.'s records, petitioner falsely recorded that payment as a lease payment to a funding source.

On July 25, 2003, petitioner caused Special Properties to transfer $174,644 from its bank account to Marquis Jet.  The SOFA petitioner filed with the Bankruptcy Court fails to show the $174,644 transfer as a business expense.

[*13] On May 7, 2003, Sentient Jet refunded $68,027 originally received from SPI, Inc., which petitioner received and deposited into the Fabian bank account.

In both 2003 and 2004, petitioner used private jets to travel for personal purposes, including traveling with his family and his dogs to his beach house in North Carolina and (perhaps without the dogs) to Disneyland. He did not use private jets to meet with Solarcom or the funding sources or to do any business related to the sale-and-leaseback transactions.

*Personal Accounts; Personal Expenses, 2004*

*Transfers to Special Properties Account*

On March 16, 2004, petitioner caused SPI, Inc., to transfer $170,000 from its bank account No. 2028 to the Special Properties bank account. On that same day, petitioner caused Special Properties to transfer a total of $169,366 from its bank account to Maximus.

On June 22, 2004, petitioner caused SPI, Inc., to transfer $123,040 from its bank account No. 2028 to the Special Properties bank account. On that same day, petitioner caused Special Properties to transfer a total of $112,053 to Maximus.

On July 9, 2004, petitioner caused Special Properties to transfer $15,000 back to SPI, Inc. bank account No. 2028.

The net amount petitioner transferred from SPI, Inc. bank account No. 2028 to the Special Properties bank account during 2004 was $278,040. During 2004, Special Properties transferred $281,419 to Maximus.

*Private Jet Payments*

On June 4, 2004, petitioner caused SPI, Inc., to transfer $174,644 from its bank account No. 2028 to Marquis Jet.

*American Patriot PAC*

On July 12, 2004, petitioner caused SPI, Inc., to transfer $700,000 from its bank account No. 2028 to the American Patriot PAC bank account. On the next day, July 13, American Patriot PAC transferred $700,000 from its bank account to the CMAT bank account.

**[\*14]** *Income Tax Returns*

The Fabians timely made a joint return of income for 2002 on Form 1040, U.S. Individual Income Tax Return. For 2003 and 2004, they similarly made joint returns of income on Forms 1040. On April 15, 2004, petitioner filed a request for an extension of time to file the Fabians' 2003 income tax return until August 15, 2004. The Fabians filed the 2003 Form 1040 on February 13, 2005. They filed the 2004 Form 1040 on December 27, 2005. Petitioner prepared the three returns.

*2002 Form 1040*

The Fabians reported $354,783 of wages on their 2002 Form 1040. They reported federal income tax withheld from Forms W–2 and 1099 of $46,425. Their reported wages and withholding do not match the information reported to the Social Security Administration (SSA) by third parties for 2002.[6] Maximus reported to the SSA on IRS Form W–2 wages paid to petitioner for 2002 of $289,853 and withheld income tax of "$11,424+." No other party reported to the SSA paying wages either to petitioner or to his spouse during 2002. The Fabians reported no income from SPI, Inc. No Form W–2 accompanies the copy of the 2002 Form 1040 stipulated by the parties. The income tax withholding of $46,425 that the Fabians claimed on their 2002 Form 1040 reduced the amount shown on the form as owing to the government from $98,814 (before credits) to $53,967, which included an estimated tax penalty of $1,578 ($98,814 + 1,578 − 46,425 = $53,967).

*2003 Form 1040*

The Fabians reported $550,000 of wages on their 2003 Form 1040. They reported federal income tax withheld from Forms W–2 and 1099 of $46,000. Their reported wages and withholdings do not match information reported by third parties to the SSA. Maximus reported to the SSA wages paid to petitioner for 2003 of $231,855 and Form W–2 withholding of $13,969. A Form W–2 from Maximus accompanying the 2003 Form 1040 agrees. No other party reported to the SSA paying wages either to petitioner or to his spouse during 2003. The Fabians reported no income from SPI, Inc. The income tax withholding of $46,000 that the Fabians reported on their 2003 Form 1040 reduced the

---

[6] A taxpayer's employer uses a Form W–3, Transmittal of Wage and Tax Statements, to transmit a copy of the taxpayer's Form W–2, Wage and Tax Statement, to the SSA, which shares relevant information with IRS. *See* Treas. Reg. § 31.6051-2.

[*15] amount shown on the form owing to the government from $115,940 (before credits) to $69,940, which, along with $71,613 claimed on account of a previous payment made with their request for an extension of the time to file, and adding an estimated tax penalty of $1,673, further reduced the amount shown as owing to the government to zero ($115,940 + 1,673 – 46,000 – 71,613 = $0).

*2004 Form 1040*

The Fabians reported $1,995,750 of wages on their 2004 Form 1040. They reported federal income tax withheld from Forms W–2 and 1099 of $504,000. Their reported wages and withholdings do not match information reported by third parties to the SSA. CMATI reported to the SSA wages paid to petitioner for 2004 of $171,875 and Form W–2 withholding of $22,000. A Form W–2 from CMATI accompanying the 2004 Form 1040 agrees. Maximus reported to the SSA wages paid to petitioner for 2004 of $121,928 and Form W–2 withholding of $6,984. A Form 4852, Substitute for Form W–2, Wage and Tax Statement, or Form 1099–R, Distributions From Pensions, Annuities, Retirement or Profit Sharing Plans, IRAs, Insurance Contracts, Etc., from Maximus accompanying the 2004 Form 1040 reports different amounts, i.e., compensation paid of $171,875 and federal income tax withheld of $22,000 (amounts identical to the amounts reported by CMATI on the Form W–2). No other party reported to the SSA paying wages either to petitioner or to his spouse during 2004. The Fabians reported no income from SPI, Inc. The income tax withholding of $504,000 that the Fabians reported on their 2004 Form 1040 reduced the amount shown on the form as owing to the government from $531,111 (before credits) to $27,111, which, along with $10,900 claimed on account of an excess Social Security tax, further reduced the amount shown as owing to the government to $16,211 ($531,111 − 504,000 – 10,900 = $16,211).

*2004 Amended Return*

On January 9, 2006, respondent filed an amended 2004 return received from the Fabians.

*Criminal Investigation and Plea Agreement*

During SPI, Inc.'s bankruptcy proceeding, the FBI and the U.S. Attorney's Office for the District of Maryland opened an investigation into SPI, Inc.'s sale-and-leaseback transactions.

[*16] After a referral from the U.S. Attorney's Office asking for IRS assistance, IRS Special Agent (SA) Genine Furguiele was assigned to investigate petitioner. SA Furguiele's task was to investigate possible criminal violations of the law over which the IRS had jurisdiction. She prepared a report recommending money laundering charges and a charge under section 7206(1) based on petitioner's filing false tax returns for 2002 and 2003 and for making a false claim for 2004.

That investigation culminated in 2007 with a multicount grand jury indictment charging petitioner with, among other crimes, mail fraud in violation of 18 U.S.C. § 1341, and making and subscribing a false tax return for 2003 in violation of section 7206(1). On May 16, 2008, petitioner pleaded guilty to one count of mail fraud and to the false-tax-return count for 2003.

Before his guilty plea, on May 13, 2008, petitioner signed a plea agreement and a supporting statement of facts (together, plea agreement) summarizing events that occurred between 2001 and 2004 and that supported his guilty plea. A principal element of the crime of mail fraud, 18 U.S.C. § 1341, is a scheme to defraud. *See, e.g.*, *United States v. Loayza*, 107 F.3d 257, 260 (4th Cir. 1997). In his plea agreement, petitioner described with particularity the fraudulent nature of SPI, Inc.'s dealings with Solarcom, including the former's not having purchased much of the computer equipment and software that it purported to sell to the latter and petitioner's having provided Solarcom with documentation, including equipment itemizations, that contained "material misrepresentations that . . . [he had] made with knowledge of their falsity." As to the proceeds of his fraudulent scheme, he admitted:

> Of the $32,000,000 that . . . [the entities] received from the funding sources through Solarcom, [petitioner] used a large sum of the money to create CMAT. [He] also used sale-leaseback proceeds, among other things, to purchase real estate in North Carolina, to make donations to his children's private school, and to pay for private jet travel.

The elements of the crime of filing a false tax return are (1) the defendant made and subscribed to a tax return containing a written declaration; (2) the tax return was made under penalties of perjury; (3) the defendant did not believe the return to be true and correct as to every material matter; and (4) the defendant acted willfully. *E.g.*, *United States v. Aramony*, 88 F.3d 1369, 1382 (4th Cir. 1996). In his

[*17] plea agreement, petitioner agreed that he "endeavored to conceal his income and assets from the IRS to evade the assessment of taxes on current income." He agreed that, on the Fabians' 2002, 2003, and 2004 Forms 1040, he overstated the amounts of income tax that had been withheld from his wages, specifically acknowledging that, with respect to the 2003 and 2004 overstatements, he acted willfully. He agreed that, for 2003 and 2004, he received income from SPI, Inc., at least a portion of which he willfully failed to report on the Fabians' Forms 1040.

In the plea agreement, petitioner also agreed that he had engaged in conduct not part of the charged offenses but relevant to them. Among other things, in 2006, to support an equipment loan from Wachovia Bank to CMAT, petitioner submitted to the bank false invoices purporting to show that CMAT had purchased computer equipment from a company, CI, LLC, notwithstanding that CMAT had not purchased computer equipment from CI, LLC.

In signing the plea agreement, petitioner agreed that he had read and reviewed the agreement with his attorney, understood it, voluntarily agreed to it, and did not wish to change any part of the statement of facts. He agreed with the United States that, had the case gone to trial, the United States would have proved beyond a reasonable doubt the facts set forth in the plea agreement.

The agreement expressly states that the IRS is not a party to it and that the IRS was "free to pursue any and all lawful remedies it may have." The U.S. District Court for the District of Maryland accepted petitioner's plea, found him guilty, and convicted him of the offenses. The court sentenced him to serve 90 months in prison. The court also ordered petitioner to pay restitution of $40,162,634 to his victims, including $974,009 to the IRS for the resulting tax loss. As of October 18, 2018, petitioner had paid only $4,595 in restitution to the IRS.

On April 4, 2019, the district court issued its order granting the United States' motion to disclose grand jury material to the IRS. The court made its order pursuant to Rule 6(e)(3)(E)(i) of the Federal Rules of Criminal Procedure (District Court's Rule 6(e) order), finding that there was a particularized need to grant limited disclosure of grand jury material in connection with another judicial proceeding, viz, this case, i.e., *Fabian v. Commissioner*, dkt. No. 25589-14. In pertinent part, the district court ordered that grand jury material in petitioner's criminal case "shall be disclosed" to the Tax Court, limited, however, to the disclosure of "information and records related to the resolution of the

**[*18]** alleged tax deficiencies and penalties for the tax years 2002, 2003, and 2004."

*Civil Examination*

In 2009, respondent assigned Revenue Agent (RA) Dolores Hicks to examine SPI, Inc.'s tax returns, which led her to an examination of the Fabians' tax returns for 2002 through 2004. RA Hicks obtained from the Bankruptcy Court boxes of documents from SPI, Inc.'s and petitioner's bankruptcy cases. The boxes contained bank statements, deposit slips, copies of canceled checks, and other financial information. She also obtained a copy of the cashflow chart. She verified the entries on the chart "line-by-line" by comparing the entries with the bank statements she had received. Although the Fabians had not reported any income from the entities on their 2002 through 2004 Forms 1040, the Cash Flow Chart showed moneys flowing in and out of bank accounts associated with SPI, Inc., Ocean Quest, CMAT, petitioner, other entities associated with petitioner, and otherwise going for what RA Hicks thought was petitioner's benefit. RA Hicks organized those cashflows into three categories: (1) payments to Ocean Quest, (2) payments to CMAT, et al., and (3) personal draws for petitioner's benefit.

*Category 1: Payments to Ocean Quest*

Petitioner caused SPI, Inc., to transfer $538,458 and $35,000 to Ocean Quest in 2003 and 2004, respectively. RA Hicks did not believe that SPI, Inc., was doing business in North Carolina real estate nor that it had any business relationship with Ocean Quest. She did not consider the transfers as paying any business expense of SPI, Inc. She considered the transfers taxable distributions from SPI, Inc., to petitioner for 2003 and 2004, respectively.

*Category 2: Payments to CMAT, et al.*

*2003*

During 2003, petitioner caused Special Properties to transfer $100,000 to CMAT and SPI, Inc., to transfer $1,900,000 to CMAT (together, $2,000,000). CMAT paid $68,336 in 2003 to purchase computers. RA Hicks considered the difference, $1,931,664 ($2,000,000 − 68,336 = $1,931,664), a taxable distribution from SPI, Inc., to

**[\*19]** petitioner in 2003 that he then used to make a capital contribution to CMAT.[7]

*2004*

During 2004, petitioner caused SPI, Inc., to transfer $3,664,000 to CMAT (net of $71,000 that CMAT returned to it).[8]   CMAT paid $80,946 in 2004 to purchase computers.   RA Hicks considered the difference, $3,583,054 ($3,664,000 − 80,946 = $3,583,054), a taxable distribution from SPI, Inc., to petitioner in 2004 that he then used to make a capital contribution to CMAT.

During 2004, petitioner caused SPI, Inc., to transfer $26,000 to CMATI.   RA Hicks considered the $26,000 a taxable distribution from SPI, Inc., to petitioner.

During 2004, petitioner caused SPI, Inc., to transfer $105,000 to CI, LLC.   RA Hicks considered the $105,000 a taxable distribution from SPI, Inc., to petitioner.

On June 4, 2004, petitioner caused SPI, Inc., to transfer $174,644 to Marquis Jet, which RA Hicks included in both her second and third categories of distributions to petitioner (i.e., payments to CMAT, et al. and personal draws for petitioner's benefit).   We will include it only in RA Hicks's third category.

During 2004, petitioner caused SPI, Inc., to make a net payment to Ansbacher of $5,000.   RA Hicks treated the payment a taxable distribution, but, on brief, respondent concedes that adjustment on the grounds that he does not have sufficient evidence of petitioner's control of Ansbacher.[9]

---

[7] Apparently, RA Hicks did not distinguish between transfers coming from SPI, Inc., and Special Properties.  We have little information about Special Properties other than that its address was the same as SPI, Inc.'s, and petitioner had signature authority on its bank account.  It was reasonable for SA Hicks to assume that it was an instrumentality of SPI, Inc.

[8] RA Hicks characterized the $71,000 CMAT returned to SPI, Inc., as a return of capital.

[9] On brief, respondent asks that, considering his concession, we treat $5,000 of a $150,000 payment that SPI, Inc., made to petitioner's children's private school, the Cambridge School, as a taxable distribution to him because it served no business purpose of SPI, Inc.  He adds that RA Hicks did not include the Cambridge School

**[\*20]** During 2004, Unknown Entity made a $25,000 payment to SPI, Inc. RA Hicks treated the payment as a return of capital, and she reduced her computation of SPI, Inc.'s 2004 taxable distributions to petitioner by that amount.

### *Summary*

In summary, considering respondent's concession with respect to the $5,000 transfer to Ansbacher, RA Hicks's double counting of both SPI, Inc.'s $70,000 transfer to CMAT, *see supra* note 5, and eliminating the $174,644 payment to Marquis Jet, RA Hicks considered the following category 2 payments from SPI, Inc., to constitute taxable distributions from it to petitioner.

| *Table 1* | | |
|---|---|---|
| Payments to CMAT, et al.: | *2003* | *2004* |
| Payments to CMAT | $1,931,664 | $3,583,054 |
| Payments to CMATI | -- | 26,000 |
| Payments to CI, LLC | -- | 105,000 |
| Payments from Unknown Entity | -- | (25,000) |
| **Total** | **$1,931,664** | **$3,689,054** |

payments as income to petitioner, respondent decided that payments to the school were distributions only during trial preparation, and he was not requesting an increased deficiency, only a substitution for the $5,000 Ansbacher payment he was not pursuing. Rule 41(b)(1) provides that an issue may be tried by implied consent where the issue was not specifically pleaded. To determine whether it is appropriate to apply the principle of implied consent, we consider whether sustaining the issue would result in unfair surprise or prejudice to the opposing party and limit the evidence that party might have otherwise introduced if the issue had been timely raised. *See, e.g., WB Acquisition, Inc. & Sub. v. Commissioner*, T.C. Memo. 2011-36, 2011 WL 477697, at \*18, *aff'd sub nom. DJB Holding Corp. v. Commissioner*, 803 F.3d 1014 (9th Cir. 2015). Respondent neither invokes Rule 41(b)(1) nor considers the potential for surprise and prejudice to petitioner. We will not accept the substitution that respondent wants.

**[\*21]** *Category 3: Personal Draws for Petitioner's Benefit*

*2003*

For 2003, Ms. Hicks considered the following transfers that petitioner caused SPI, Inc., and Special Properties to make, along with the refund from Sentient Jet, taxable distributions from SPI, Inc., to petitioner.

| Table 2 | |
| --- | --- |
| *Type* | *Amount* |
| Transfers on various dates from SPI, Inc. bank account No. 2028 to the Fabian bank account | $676,644 |
| January 6 and July 25 transfers from Special Properties bank account to the Fabian bank account | 30,000 |
| April 25 transfer from SPI, Inc. bank account No. 2028 to the Fabian brokerage account | 20,000 |
| July 25 transfer from Special Properties bank account to the Fabian brokerage account | 20,000 |
| February 21 transfer from SPI, Inc. bank account No. 2028 to Marquis Jet | 164,527 |
| July 25 transfer from Special Properties bank account to Marquis Jet | 174,644 |
| May 7 Sentient Jet refund deposited into the Fabian bank account | 68,027 |
| **Total** | **$1,153,842** |

RA Hicks considered the two transfers to the Fabian bank account taxable distributions from SPI, Inc., directly to petitioner. She considered the payments for jet travel taxable distributions to him from SPI, Inc., because he used the jets for personal travel and not for SPI, Inc.'s business. She considered the refund a taxable distribution to him because he deposited it into his personal account.

*2004*

For 2004, Ms. Hicks considered the following transfers that petitioner caused SPI, Inc., to make, net of the July 9 retransfer, taxable distributions from it to him.

| [*22] | Table 3 |
|---|---|
| *Type* | *Amount* |
| March 16 transfer from SPI, Inc. bank account No. 2028 to the Special Properties bank account ($169,366 of which was, on the same day, transferred to Maximus) | $170,000 |
| June 22 transfer from SPI, Inc. bank account No. 2028 to the Special Properties bank account ($112,053 of which was, on the same day, transferred to Maximus) | 123,040 |
| July 9 transfer from Special Properties to SPI, Inc. bank account No. 2028 | (15,000) |
| June 4 transfer from SPI, Inc. bank account No. 2028 to Marquis Jet | 174,644 |
| Transfer from SPI, Inc. bank account No. 2028 to the American Patriot PAC bank account (retransferred the next day to CMAT) | 700,000 |
| **Total** | **$1,152,684** |

RA Hicks considered the net amount transferred from SPI, Inc., to Special Properties, $278,040, a taxable distribution to petitioner because, concomitant with the transfers to Special Properties, Special Properties transferred in excess of that amount (viz, $281,419) to Maximus. RA Hicks believed that petitioner caused that to be done to "launder," or disguise, the source of Special Properties payments to Maximus so that Maximus would not learn of the existence of SPI, Inc., and petitioner's involvement of Maximus in his fraudulent sale-and-leaseback transactions. As for 2003, she considered the payment to Marquis Jet a taxable distribution to petitioner from SPI, Inc., because he used the jet for personal travel and not for SPI, Inc.'s business. She considered the indirect transfer to CMAT a taxable distribution from SPI, Inc.

*Summary*

With adjustments for RA Hicks's double counting of $70,000 and $174,644 and respondent's concession of a $5,000 transfer, the following table summarizes RA Hicks's calculation of petitioner's unreported income resulting from payments made by SPI, Inc.

| [*23] | Table 4 | |
|---|---|---|
| | *2003* | *2004* |
| Payments to Ocean Quest | $538,458 | $35,000 |
| Payments to CMAT, et al. | 1,931,664 | 3,689,054 |
| Payments to petitioner's personal accounts | 1,153,842 | 1,152,684 |
| **Total** | **$3,623,964** | **$4,876,738** |

*Penalty Approval*

On October 12, 2010, RA Hicks prepared an IRS Penalty Approval Form, Workpaper # 300-1.1, seeking approval to assert a section 6663 fraud penalty. The form identifies petitioner as the taxpayer to be penalized and, in the heading, identifies "2006" as the relevant tax year. The body of the form, however, speaks exclusively of 2002, 2003, and 2004 as the years for which approval is being sought. RA Hicks testified that the heading was in error and should have identified 2002, 2003, and 2004 as the relevant years. RA Hicks submitted the form to her group manager, Steven Hansen, for approval, which he gave on April 14, 2011, by signing the form. Mr. Hansen was, at the time, RA Hicks's immediate supervisor. On the following day, respondent mailed to petitioner a Letter 950, a so-called 30-day letter, enclosing RA Hicks's examination report, which included the fraud penalty for all years, and explaining petitioner's options, including the right to appeal to the IRS Appeals Office (now the IRS Independent Office of Appeals).

*Notice*

In determining whether there were deficiencies in tax for the years at issue, respondent made both positive and negative adjustments to the Fabians' taxable income and adjusted certain credits and other taxes (e.g., household employment tax). Respondent determined no deficiency in tax for 2002 but determined an overassessment (decrease in tax) of $5,568. Because certain prepayment credits (including income tax withholding) are not considered in the determination of a deficiency in tax, *see* § 6211(b)(1), the notice separately makes an adjustment to the credit for income tax withholding claimed by the Fabians on the 2002 Form 1040. The Fabians had claimed a credit of $46,425 for income tax withheld by Maximus. Because Maximus had reported to the SSA withheld income tax of only $11,424, the notice makes a negative adjustment of $35,001 to the claimed credit ($46,425 − 11,424 = $35,001). Netting the $5,568 overassessment against the disallowed

[*24] withholding credit of $35,001, the notice determines that the Fabians underpaid their 2002 tax by $29,433 ($35,001 − 5,568 = $29,433). The notice determines a 75% section 6663 fraud penalty of $22,075 for that underpayment ($29,433 × 75% = $22,075).

For each of 2003 and 2004, the notice both determines a deficiency in tax and makes a negative adjustment to the credit for income tax withholding claimed by the Fabians. The notice explains that the Fabians income is being adjusted upward for each year to reflect unreported items—"bank deposits, withdrawals, and transfers"—shown in a table similar to Table 4, *supra*. The resulting underpayment in tax for the year is combined with the additional underpayment for the year resulting from the negative credit adjustment, and the section 6663 fraud penalty is applied to the sum. The notice also determines an addition to tax for each year for failure to timely file a return.

OPINION

I.    *Evidentiary Matters*

As an initial matter we address petitioner's objection to SA Furguile's testimony. Rule 6(e)(2)(A) and (B) of the Federal Rules of Criminal Procedure governs the secrecy of grand jury proceedings and prohibits certain persons from disclosing a matter occurring before the grand jury unless the rules provide otherwise. SA Furguile assisted the U.S. Attorney's Office in its prosecution of petitioner, and one of the office's attorneys may have disclosed to her a matter occurring before the grand jury that placed her in the class of persons prohibited from disclosing that matter unless an exception applies. *See* Fed. R. Crim. P. 6(e)(2)(B)(vii), (3)(A)(ii). And while petitioner is familiar with the District Court's Rule 6(e) order, he argues that "[t]he order . . . does not explicitly or implicitly" authorize SA Furguile's testimony. For that reason, petitioner continues, "[r]espondent should not be permitted to make any findings of fact based on" her testimony.

We disagree. The consequence of the District Court's Rule 6(e) order was to authorize a disclosure of a grand jury matter. The order did not specify a particular actor authorized to make the disclosure but simply ordered that the referenced grand jury material in petitioner's case "shall be disclosed." Implicit in that order is that someone otherwise prohibited from disclosing the material may, with impunity, disclose it to one of the permitted recipients, i.e., to the Tax Court. SA Furguile may well have been a member of the class of persons otherwise

**[\*25]** prohibited from disclosing the material, but the order freed her, as it did everyone in that class, to disclose the material within the parameters set by the order. To the extent SA Furguile's testimony touched on grand jury material in petitioner's criminal case, we see no violation of the grand jury secrecy rule established by Rule 6(e)(2)(A) and (B) of the Federal Rules of Criminal Procedure. There is no merit to petitioner's objection to her testimony, and we overrule his objection.[10]

II.     *Period of Limitations*

A.     *Introduction*

Generally, the period of limitations to assess any unpaid income tax (including penalties and additions to tax) runs three years from the later of (1) the date a taxpayer files a return or (2) the last day prescribed by law or by regulations for filing the return. *See* § 6501(a) and (b)(1). If a taxpayer files a false or fraudulent return with the intent to evade tax, however, the tax may be assessed at any time. § 6501(c)(1). The period of limitations is an affirmative defense, which must be pleaded. *See* Rule 39. If the taxpayer raises the defense and the Commissioner relies on section 6501(c)(1) to show that the period of limitations has not expired, the Commissioner bears the burden to prove that the taxpayer has filed a false or fraudulent return with the intent to evade tax for each year at issue. *See* § 7454(a); Rule 142(b). Fraud for this purpose is defined as intentional wrongdoing by the taxpayer with the specific purpose of avoiding tax believed to be owed. *E.g.*, *Schwartz v. Commissioner*, T.C. Memo. 2016-144, at \*19, *aff'd in an unpublished order*, No. 16-2502, 2017 WL 5125662 (6th Cir. Sept. 5, 2017). "Put differently, imposition of the civil fraud penalty is appropriate upon a showing that the taxpayer intended to evade taxes believed to be owing by conduct designed to conceal, mislead, or otherwise prevent the collection of taxes." *Id.* (citing *DiLeo v. Commissioner*, 96 T.C. 858, 874 (1991), *aff'd*, 959 F.2d 16 (2d Cir. 1992)). The determination of fraud for the period of limitations on assessment under section 6501(c)(1) is the same as the determination of fraud for purposes of the penalty under section 6663. *Neely v. Commissioner*, 116 T.C. 79, 85 (2001).

---

[10] Petitioner also objects to the Court's giving weight to the testimony of Mr. Peroutka, the forensic accountant retained by Mr. Guttman, the bankruptcy trustee. Because we have not relied on Mr. Peroutka's testimony, we do not address petitioner's objection.

**[\*26]** Because direct evidence of an intent to evade tax is rarely available, intent may be proved by circumstantial evidence and reasonable inferences from the facts. *E.g.*, *Feller v. Commissioner*, 135 T.C. 497, 501–02 (2010). If any part of a return is determined to be the result of fraud, a taxpayer may not assert as a defense that the period of limitations has expired. *E.g.*, *Lowy v. Commissioner*, 288 F.2d 517, 520 (2d Cir. 1961), *aff'g* T.C. Memo. 1960-32; *Garavaglia v. Commissioner*, T.C. Memo. 2011-228, 2011 WL 4448913, at \*30, *aff'd*, 521 F. App'x 476 (6th Cir. 2013). Moreover, it is sufficient to satisfy section 6501(c)(1) that one spouse filing a joint return had the requisite fraudulent intent. *See, e.g.*, *Vannaman v. Commissioner*, 54 T.C. 1011, 1018 (1970).

Petitioner asserts as a defense to respondent's attempt to collect any of the deficiencies, additions to tax, and penalties at issue that the periods of limitations for assessment and collection for all the years at issue have expired. Respondent relies on section 6501(c)(1), the plea agreement, and certain other established facts to rebut petitioner's defense. As discussed *infra*, petitioner's defense fails.

B. *Discussion*

Petitioner pleaded guilty to mail fraud and to making and submitting a false tax return for 2003 in violation of section 7206(1). He admitted in his plea agreement that, on the Fabians' 2002, 2003, and 2004 Forms 1040, he overstated the amount of income tax that had been withheld from his wages. And while he specifically acknowledged that he acted willfully with respect to the 2003 and 2004 overstatements, we cannot escape the conclusion that, notwithstanding the lack of a specific acknowledgment of willfulness with respect to the 2002 overstatement, he also acted willfully with respect to that overstatement. He admitted receiving income from SPI, Inc., for 2003 and 2004 that he failed to report. Without attaching any temporal limitation to his admission of filing false income tax returns for 2002, 2003, and 2004, petitioner admitted that he had "endeavored to conceal his income and assets from the IRS to *evade* the assessment of taxes on current income." (Emphasis added.)

Petitioner's admissions are sufficient for us to conclude that he intended to evade taxes believed to be owing for 2002, 2003, and 2004 by deceiving the IRS as to the amount of tax withheld from his wages each year and, additionally, for 2003 and 2004, by concealing income he received from SPI, Inc.

**[\*27]** Petitioner takes exception to our considering the plea agreement, arguing that we should disregard the agreement because a conviction under section 7206(1) is insufficient to establish fraud, respondent is treating the plea agreement as testimony, and the agreement is inadmissible hearsay. Respondent's response to petitioner's first claim is that he is not relying on petitioner's conviction to establish fraud but relies on it only as a "badge of fraud." *See Sodipo v. Commissioner*, T.C. Memo. 2015-3, at \*23 (stating that "a conviction under section 7206(1) is a badge of fraud"; i.e., something "from which fraudulent intent may be inferred"), *aff'd*, 633 F. App'x 148 (4th Cir. 2016).

Petitioner's second claim, that respondent is treating his plea agreement as testimony, apparently results from our refusal in *Neder v. Commissioner*, T.C. Memo. 2006-54, 2006 WL 741386, at \*8, to consider the taxpayer's testimony in his prior criminal case, in which he was convicted of filing false income tax returns, as a badge of fraud in his subsequent civil trial, in which the addition to tax for fraud was an issue; but the taxpayer's testimony in the prior criminal case was not part of the record before us. *Neder* is inapropos because petitioner's plea agreement is part of the record before us. We often rely on statements in a taxpayer's plea agreement in his or her criminal case as evidence of fraud in a following civil fraud penalty case. *See, e.g.*, *Laciny v. Commissioner*, T.C. Memo. 2013-107, at \*19–20; *Evans v. Commissioner*, T.C. Memo. 2010-199, 2010 WL 3564727, at \*6 ("The details alleged in the counts of which he was convicted [including filing a false tax return in violation of section 7206(1)] and admitted in the plea agreement are specific and convincing evidence of fraud . . . ."), *aff'd*, 507 F. App'x 645 (9th Cir. 2013).

Petitioner's third argument, that his plea agreement is excludible hearsay, has no merit because an opposing party's statement offered against the party is not hearsay. *See* Fed. R. Evid. 801(d)(2)(A).

We find that respondent has shown by clear and convincing evidence that petitioner made his returns for the years at issue with the intent to evade tax. *See, e.g.*, *Feller*, 135 T.C. 497 (involving taxpayer who overstated income tax withheld in order to obtain refunds).

C.  *Conclusion*

Because we find that the Fabians filed returns for the years at issue fraudulently with the intent to evade tax, it follows that the

**[\*28]** periods of limitations on assessment are open for those years.  *See* § 6501(c)(1).[11]

III.  *Deficiencies in Tax*

    A.  *Introduction*

        For decision is whether the Fabians underreported their gross income for 2003 and 2004 on account of the payments listed *supra* Table 4, viz,

| Table 4 | | |
|---|---|---|
| | *2003* | *2004* |
| Payments to Ocean Quest | $538,458 | $35,000 |
| Payments to CMAT, et al. | 1,931,664 | 3,689,054 |
| Payments to petitioner's personal accounts | 1,153,842 | 1,152,684 |
| **Total** | **$3,623,964** | **$4,876,738** |

Petitioner contests neither the amounts of the payments (sometimes, collectively, Table 4 payments) nor that SPI, Inc., made them.  With respect to SPI, Inc.'s payments to Ocean Quest, petitioner claims without elaboration only that "[p]ayments in [2003 and 2004] to Ocean Quest LLC are not taxable to [him]."  With respect to SPI, Inc.'s payments in 2003 to CMAT, he claims that the payments are not taxable to him because they "have been reported on CMAT's tax returns," and, similarly, with respect to SPI, Inc.'s 2004 payments to CMAT and CMATI, "they were reported as income by CMAT and CMATI."  With respect to Ms. Hicks's third category, personal draws for petitioner's benefit, he concedes that most of the payments were distributions made by SPI, Inc., to him with respect to his stock in the corporation and would be dividends but, he argues, for the fact that the corporation had no earnings and profits and his adjusted basis in his shares in the corporation exceeded the amounts of the payments.  He argues that the payments to Marquis Jet were properly treated under the law at the time the payments were made.  Finally, he argues that payments to his personal accounts were loans to him from SPI, Inc.

---

[11] In the Petition, petitioner also raises the affirmative defense of laches.  But not having addressed the defense on brief, he is considered to have abandoned it, *see, e.g.*, *Burke v. Commissioner*, T.C. Memo. 2009-282, 2009 WL 4639695, at \*5, and we will not further address it.

**[\*29]** Respondent has two theories as to why the Table 4 payments are includible in petitioners' gross income for the years indicated. First:

> Petitioner earned income from conducting illegal fraudulent sale-leaseback transactions through SPI, Inc. He had dominion and control over all the funds earned from the scheme[,] and he treated those funds as his own. Accordingly, the millions of dollars that petitioner stole from the Funding Sources is ordinary income to him[,] and he is required by law to report the income on his tax return.

(Citations of the record omitted.)

Alternatively, respondent argues that the Table 4 payments were direct or constructive distributions of income illegally earned by SPI, Inc., that constituted taxable dividends to petitioner because paid out of the corporation's earnings and profits.

We rely on respondent's alternative theory except, only in part, with respect to the payments to CMAT.

## B. *Petitioner's Income from Conducting Illegal Activities*

The threshold for respecting the corporate form for tax purposes is low. *See Moline Props., Inc. v. Commissioner*, 319 U.S. 436, 438–39 (1943). Respondent proposes to include in petitioner's income the amounts shown in Table 4. But those amounts are payments *out* of SPI, Inc. If, instead, we are to disregard SPI, Inc.'s jural existence and treat petitioner as recognizing income as and when received *by* the corporation, almost certainly respondent's adjustments for the years at issue would have differed from the Table 4 amounts. But respondent did not determine alternative deficiency amounts. We will, therefore, proceed to his alternative theory.

## C. *Distributions with Respect to Corporate Stock*

### 1. *In General*

Sections 301 and 316 govern the characterization of a corporate distribution of property (including money) to a shareholder with respect to its stock. If the distributing corporation has sufficient earnings and profits, then the distribution is a dividend, which is included in the shareholder's gross income. §§ 301(c)(1), 316. If the distribution exceeds the corporation's earnings and profits, the excess is, first, a return of

**[\*30]** capital, and any remaining amount is taxed as capital gain. § 301(c). Among the items entering the computation of corporate earnings and profits for a particular period are items includible in gross income under section 61. *See* Treas. Reg. § 1.312-6(b). Gross income includes income derived from a business, regardless of whether the business is lawful or whether the money was obtained unlawfully. *See* § 61(a)(2); *James v. United States*, 366 U.S. 213, 221 (1961) (holding that embezzled funds are included in gross income); *United States v. Sullivan*, 274 U.S. 259, 263 (1927) (holding that income from an unlawful business is included in gross income). Generally, the taxpayer bears the burden of proving that the corporation lacks sufficient earnings and profits to support dividend treatment. *Truesdell v. Commissioner*, 89 T.C. 1280, 1295–96 (1987); *see also Luczaj & Assocs. v. Commissioner*, T.C. Memo. 2017-42, at \*22–23.

### 2. *Petitioner's Theory*

Petitioner believes that, during the years at issue, SPI, Inc., had no earnings and profits, so that any of the Table 4 payments determined to be distributions with respect to SPI, Inc.'s stock would not be dividends. *See* §§ 301(c)(1), 316(a); *see also Podlucky v. Commissioner*, T.C. Memo. 2022-45, at \*9 (holding that constructive distributions of misappropriated corporate funds did not constitute dividends to controlling shareholder because of inadequate corporate earnings and profits). Moreover, he believes that he had sufficient adjusted basis in his SPI, Inc. shares that the amount of actual or constructive distributions to him during those years did not exceed that basis and, accordingly, produced no gain. *See* § 301(c)(2). We disagree that petitioner has shown that SPI, Inc.'s earnings and profits were insufficient for the Table 4 payments to constitute dividends.

### 3. *Distributions with Respect to Stock*

#### a. *Constructive Distributions*

We first address whether the Table 4 payments were constructive distributions with respect to SPI, Inc.'s stock.

Characterization of a payment by a corporation as a distribution with respect to its stock depends neither upon the corporation's formally declaring a dividend nor upon a shareholder's actually receiving it. *See, e.g.*, *Boulware v. United States*, 552 U.S. 421, 430 (2008); *Combs v. Commissioner*, T.C. Memo. 2019-96, at \*12-13, *aff'd*, 859 F. App'x 807 (9th Cir. 2021). A dividend not formally declared is a constructive

**[\*31]** dividend. *See Combs*, T.C. Memo. 2019-96, at \*12.[12] The test for a constructive dividend has two prongs: First, the corporation must have conferred an economic benefit on the shareholder without expectation of repayment, and, second, the benefit conferred by the corporation must primarily advance the shareholder's personal interest as opposed to the business interest of the corporation. *See, e.g.*, *Midwest Stainless, Inc. v. Commissioner*, T.C. Memo. 2000-314, 2000 WL 1470664, at \*4. Petitioner was SPI, Inc.'s sole shareholder. A constructive distribution may result when a controlling shareholder has the effective power to direct the flow of corporate wealth to another without routing the transaction through his own hands. *Green v. United States*, 460 F.2d 412, 419 (5th Cir. 1972).

b. *Ocean Quest*

From 2000 through 2005, petitioner vacationed with his family in North Carolina, and, during that period, he testified, he and his wife purchased at least two beach houses there. In 2003 and 2004, he caused SPI, Inc., to transfer $538,458 and $35,000, respectively, to Ocean Quest, which it used to purchase beach houses in Holden Beach, North Carolina. Petitioner was both managing director and a member of Ocean Quest, and, while the record is silent as to the identity of the other members, we think it a fair inference that his wife and, perhaps, other family members were the remaining members. Mr. Guttman determined that SPI, Inc.'s, payments to Ocean Quest were not of any benefit to SPI, Inc. We agree. Whether Ocean Quest bought houses for the Fabian family to use or for investment, the transfers from SPI, Inc., to Ocean Quest benefited petitioner personally, and petitioner has not shown that either he or Ocean Quest was under any obligation to repay the moneys received from SPI, Inc. Petitioner's exercise of his control over SPI, Inc., to direct funds to Ocean Quest for no apparent benefit to the former and for his own benefit is sufficient for us to conclude that the moneys paid to Ocean Quest constituted constructive distributions by SPI, Inc., to petitioner with respect to his stock in the corporation (which, in effect, he then paid over to Ocean Quest). The Table 4 amounts shown as "Payments to Ocean Quest" constitute constructive distributions to petitioner.

---

[12]Courts sometimes speak colloquially of a corporate distribution to a shareholder with respect to his stock as a "dividend" without considering that section 316 accords the term a technical meaning. We will be precise when necessary.

**[\*32]**            c.      *CMAT*

We turn now to the payments to CMAT. Mr. Guttman determined that SPI, Inc.'s payments to CMAT were not of any benefit to the latter and, except for CMAT's expenditure of a small amount for computers for underprivileged children, benefited only petitioner. Moreover, as with the payments to Ocean Quest, petitioner, through his control of SPI, Inc., orchestrated the payments to CMAT; and we find that CMAT was under no obligation to repay the moneys received. Moreover, at least some of the moneys that SPI, Inc., paid to CMAT directly benefited petitioner personally (e.g., a $335,000 payment in 2004 from CMAT into his swimming pool construction account). Despite that, SPI, Inc.'s payments to CMAT cannot be analyzed on the same terms as its payments to Ocean Quest because CMAT was an organization described in section 501(c)(3) to which gifts were likely deductible as charitable contributions. *See* § 170(a).

In *Knott v. Commissioner*, 67 T.C. 681 (1977), we addressed a bargain sale by a closely held corporation to an organization exempt from tax under section 501(c)(3) and to which gifts would be deductible as charitable contributions under section 170(a). We held that, because neither the shareholders of the corporation nor their families received any property or economic benefit from the sale, there was no constructive distribution to the shareholders as a result of the sale. *Id.* at 694. The Commissioner has acquiesced in our holding in *Knott*. *See* Rev. Rul. 79-9, 1979-1 C.B. 125, 126 ("[P]roperty or an economic benefit must be received by the controlling shareholders or their families as a result of the corporation's charitable contribution in order for the contribution to be treated as a constructive dividend to the shareholders."). It may be that respondent overlooked *Knott* and his Revenue Ruling, but, in any event, we would look with disfavor on any effort by respondent to take a position contrary to one of his own revenue rulings. *See, e.g.*, *Rauenhorst v. Commissioner*, 119 T.C. 157, 171 (2002) (rejecting the proposition "that the Commissioner is not bound to follow his revenue rulings in Tax Court proceedings").

We have made some findings from which we can determine for 2003 and 2004 economic benefits obtained by petitioner from CMAT. During 2003, CMAT transferred $446,000 and $30,000 to the Fabian bank account and to Ocean Quest, respectively (in total, $476,000). During 2004, CMAT transferred $581,000 and $335,000 to the Fabian bank account and to an account for the construction of a swimming pool at petitioner's home, respectively (in total, $916,000). In accordance

**[\*33]** with *Knott* and Rev. Rul. 79-9, we find that for 2003 and 2004 petitioner received constructive distributions from SPI, Inc., on account of its payments to CMAT, of $476,000 and $916,000, respectively. [13]

### d. *CMATI*

In 2004, petitioner was chief executive officer of CMATI, a subsidiary, for-profit corporation of CMAT (of which he was a board member and also CEO). In 2004, he caused SPI, Inc., to transfer $26,000 to CMATI. Petitioner abused his authority as CEO of CMAT to benefit himself, and we think that is evidence that he could use his authority as CEO of CMATI for the same end. Petitioner has not convinced us that CMATI had any obligation to repay the moneys it received from SPI, Inc. The $26,000 paid by SPI, Inc., to CMATI in 2004 constituted a constructive dividend to petitioner with respect to his stock in the former. Therefore, the Table 1 amount shown as "Payments to CMATI" constitutes a constructive distribution to petitioner.

### e. *CI, LLC*

We likewise conclude that the Table 1 amount shown as "Payments to CI, LLC" constitutes a constructive distribution to petitioner. Petitioner did not own CI, LLC, but, during 2004, he caused SPI, Inc., to transfer $105,000 to the entity, which it used to further petitioner's corrupt scheme to obtain money from the funding sources.

---

[13]Respondent's notice determines no deficiency in any of the excise taxes provided for in section 4958. Section 4958 imposes excise taxes on excess benefit transactions between disqualified persons and section 501(c)(3) or (4) organizations. The excise tax, which is paid by the disqualified person, is imposed on the amount received by the disqualified person that exceeds the value of consideration provided to the organization. Section 4958 also requires correction of the excess benefit transaction or a second-tier tax of 200% is imposed. Organization managers may also be liable for section 4958 excise taxes if they knowingly participate in an excess benefit transaction. Excess benefit transactions are situations where a section 501(c)(3) or (4) organization is used for improper personal gain by a person in a position to exercise substantial influence over its affairs. The section 4958 taxes are popularly known as "intermediate sanctions," because they provide a remedy short of revocation of exempt status for transactions that constitute inurement. A deficiency in such taxes is collected pursuant to the deficiency procedures provided for in section 6212.

**[*34]**     f.     *Unknown Payment*

We make no adjustment with respect to the unknown payment.

g.     Revision to Table 1

To take account of our analysis of the CMAT payments, we revise Table 1 as follows (now Table 1.a.).

| Table 1.a | | |
|---|---|---|
| Payments to CMAT, et al. | *2003* | *2004* |
| Payments to CMAT | $476,000 | $916,000 |
| Payments to CMATI | -- | 26,000 |
| Payments to CI, LLC | -- | 105,000 |
| Payments from Unknown Entity | -- | (25,000) |
| **Total** | **$476,000** | **$1,022,000** |

h.     *Personal Draws for Petitioner's Benefit*

Petitioner does not address on brief the payments from SPI, Inc., that Ms. Hicks included in her category "Personal draws for petitioner's benefit" other than the payments to Marquis Jet. Petitioner appears to believe that those payments were an employee fringe benefit paid by SPI, Inc., and addresses the amount of deduction SPI, Inc., would be allowed on account of the payments. The discussion is not relevant because we do not have the corporation's tax liability before us. And while petitioner concludes his discussion of the Marquis Jet payments by adding that respondent has accepted that he reimbursed the corporation for those payments—which we take as his admission that the payments were for his benefit—RA Hicks, in her examination report, states that petitioner's bank account records did not match his claims of reimbursement. Indeed, petitioner proposes that we find that SPI, Inc., recorded *all* disbursements to him as advances on its financial books and records. Respondent points out that, while that statement might literally be true, it is misleading because petitioner is relying on the SOFA, which the record shows contained numerous false entries (and which, *supra* p. 9, we find to be a false statement that petitioner filed with the bankruptcy court). The payments Ms. Hicks categorized as for petitioner's benefit were made for his benefit, and he has failed to convince us that any were advances from the corporation that he was obligated to (or expected to) repay. For those reasons, we conclude that

[*35] those payments were distributions by SPI, Inc., to petitioner made with respect to the corporation's stock.

i. *Revision to Table 4*

To take account of new Table 1.a, we revise Table 4 as follows (now Table 4.a).

| Table 4.a | | |
|---|---|---|
| | *2003* | *2004* |
| Payments to Ocean Quest | $538,458 | $35,000 |
| Payments to CMAT, et al. | 476,000 | 1,022,000 |
| Payments to petitioner's personal accounts | 1,153,842 | 1,152,684 |
| **Total** | **$2,168,300** | **$2,209,684** |

Table 4.a. reports constructive distributions to petitioner with respect to his stock in SPI, Inc.  We next consider whether those distributions constituted dividends includible in petitioner's gross income.

4. *Table 4.a Payments Out of Earnings and Profits*

SPI, Inc., was the vehicle that petitioner used to carry out his fraudulent scheme.  It was the counterparty in the sale-and-leaseback transactions with Solarcom.  Petitioner makes no argument that we should disregard SPI, Inc.'s corporate existence, and, as we said *supra* p. 29, the threshold for respecting the corporate form for tax purposes is low.  Ostensibly, SPI, Inc., realized gain on each computer or software item sold only to the extent that the amount realized on the sale exceeded the corporation's cost for the property sold.  *See* Treas. Reg. § 1.1001-1(a).  To the extent, however, that SPI, Inc., sold phantom property, its "gain" likely would equal (or, if there were selling expenses, come close to equaling) the amount received for the property.  And while the lulling payments might be deductible, it is likely that SPI, Inc.'s taxable income from the fraudulent sales was considerable, resulting in an equally considerable increase in earnings and profits.  *See* Treas. Reg. § 1.312-6(b).

Petitioner's answer is:  "The proceeds from Solarcom were borrowed funds and as such were debt capital and not earnings and profits.  As such, any distributions were not taxable to the Petitioner."  Petitioner would disavow the form of the sale-and-leaseback

**[\*36]** transactions SPI, Inc., claimed to have entered into, which, at least in form (fraud aside), were supposed to involve SPI, Inc.'s sale of computers and software to Solarcom, followed by Solarcom's lease of the computers and software back to SPI, Inc., which, as lessee, would make some business use of the property while Solarcom, as owner, would enjoy the tax benefits (e.g., depreciation) that usually accompany ownership of business property.[14] *Compare Frank Lyon Co. v. United States*, 435 U.S. 561 (1978) (successful transfer), *with, e.g.*, *Guaderrama v. Commissioner*, T.C. Memo. 2000-104 (unsuccessful transfer), *aff'd*, 21 F. App'x 858 (10th Cir. 2001). Having structured the transactions apparently to obtain tax benefits at least for Solarcom, petitioner is not free to disavow that form in favor of what he now claims is the transaction's economic substance. *See, e.g., Complex Media, Inc. v. Commissioner*, T.C. Memo. 2021-14, at \*64.

Considering the transactions as structured, petitioner has failed to show that SPI, Inc., did not have income on the sale of property to Solarcom, so that the Table 4.a payments—distributions with respect to petitioner's SPI, Inc. stock—were not out of its earnings and profits and, accordingly, were dividends includible in petitioner's gross income. *See* §§ 301(c)(1), 316(a).

IV.    *Fraud Penalty*

   A.    *Introduction*

Respondent has already established with respect to the years at issue that petitioner intended to evade tax and, thus, engaged in fraudulent conduct. *See supra* pt. II.C. For the fraud penalty to attach, however, he must prove also that the fraud resulted in the underpayments of tax required to be shown on the returns.

Section 6663(a) provides: "If any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 75 percent of the portion of the underpayment which is attributable to fraud." Moreover, if the Commissioner establishes that some part of an underpayment was due

---

[14] It is unclear whether SPI, Inc., borrowed from Solarcom the amounts it was to spend for the equipment that it was to sell to, and then lease back from, Solarcom. If it did, we assume that the parties treated SPI, Inc.'s resulting indebtedness as discharged by way of a credit to the sales price of the property purchased by Solarcom, which credit would be included in the amount realized by SPI, Inc., on that sale and treated as part or all of Solarcom's cost basis in the property.

**[*37]** to fraud, the entire underpayment is treated as attributable to fraud unless the taxpayer proves otherwise. § 6663(b). The fraud penalty may be applied against a spouse only where some part of the underpayment is due to the fraud of the spouse. § 6663(c). And finally, no fraud penalty will be imposed with respect to any portion of an underpayment if the taxpayer can show "that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to [it]." § 6664(c)(1).

The term "underpayment" is defined in section 6664(a) as follows:

> Sec. 6664(a). Underpayment.—For purposes of this part, the term "underpayment" means the amount by which any tax imposed by this title exceeds the excess of—
> (1) the sum of—
> (A) the amount shown as the tax by the taxpayer on his return, plus
> (B) amounts not so shown previously assessed (or collected without assessment), over
> (2) the amount of rebates made.
> For purposes of paragraph (2), the term "rebate" means so much of an abatement, credit, refund, or other repayment, as was made on the ground that the tax imposed was less than the excess of the amount specified in paragraph (1) over the rebates previously made.

Neither paragraph (1)(B) nor (2) applies in this case.

Treasury Regulation § 1.6664-2(c)(1) interprets the definition of "underpayment" in section 6664 by stating that, for purposes of determining an underpayment, the amount shown as the tax by the taxpayer on his return is reduced by the excess of:

> (i) The amounts shown by the taxpayer on his return as credits for tax withheld under section 31 (relating to tax withheld on wages) . . ., over

> (ii) The amounts actually withheld . . . with respect to a taxable year before the return is filed for such taxable year.

**[\*38]** In other words, the regulation interprets the meaning of "underpayment" to include a taxpayer's overstated credits for withholding. *See* Treas. Reg. § 1.6664-2(g) (example 3). Accordingly, if a taxpayer overstates a prepayment credit for wages withheld, the overstatement decreases the amount of tax shown on the return and increases the underpayment of tax. *Feller*, 135 T.C. at 503.

The amount of tax shown due on a taxpayer's return also includes amounts shown as additional tax on a qualified amended return "except that such amount is not included if it relates to a fraudulent position on the original return." *See* Treas. Reg. § 1.6664-2(c)(2). As relevant here, a qualified amended return is an amended return filed after the due date for the return but before the taxpayer is first contacted by the IRS concerning any examination with respect to the return. *See id.* subpara. (3)(i)(A).

Finally, for respondent to carry the burden of production that section 7491(c) imposes on him with respect to penalties, he must make a prima facie case that imposition of the penalty is appropriate, *see, e.g.*, *Costello v. Commissioner*, T.C. Memo. 2021-9, at \*20, which includes establishing compliance with the supervisory approval requirement of section 6751(b), *see Graev v. Commissioner*, 149 T.C. 485, 493 (2017), *supplementing and overruling in part* 147 T.C. 460 (2016). Section 6751(b)(1) provides: "No penalty under this title shall be assessed unless the initial determination of such assessment is personally approved (in writing) by the immediate supervisor of the individual making such determination or such higher level official as the Secretary may designate."

If the Commissioner carries his burden of production, the taxpayer has the burden of proving that any affirmative defenses apply, such as reasonable cause. *E.g.*, *Costello*, T.C. Memo. 2021-9, at \*20.

B.     *Underpayments of Tax*

1.     *Underpayments Exist*

To prove the existence of an underpayment, the Commissioner may not rely on a taxpayer's failure to carry his or her burden of proof with respect to the underlying deficiency. *Parks v. Commissioner*, 94 T.C. 654, 660–61 (1990). The Commissioner must prove only that an underpayment exists, however, and not the precise amount of the underpayment. *DiLeo*, 96 T.C. at 873.

[*39] "A taxpayer's conviction pursuant to section 7206(1) estops him or her from contesting that an underpayment exists for the years at issue in the criminal case." *Laciny*, T.C. Memo. 2013-107, at *15; *see also Seiffert v. Commissioner*, T.C. Memo. 2014-4, at *13, *supplemented by* T.C. Memo. 2014-61. Petitioner's criminal conviction under section 7206(1) estops him from contesting that an underpayment exists for 2003.

Regarding 2002 and 2004, as reported *supra* pp. 16–17, petitioner admitted in the plea agreement that, on the Fabians' returns for those years, he overstated the amount of income tax that had been withheld on his wages. He was represented by counsel when he executed the agreement, and he agreed that, had the case gone to trial, the United States would have proved beyond a reasonable doubt the facts set forth in the agreement. Overstated income tax withholding constitutes an underpayment of tax. *See Feller v. Commissioner*, 135 T.C. 497; Treas. Reg. § 1.6664-2(c)(1). Petitioner's admissions as to 2002 and 2004 are sufficient to satisfy respondent's burden of proving that the Fabians underpaid their federal income tax for those years. *See, e.g.*, *Laciny*, T.C. Memo. 2013-107, at *15 (holding that taxpayer's acknowledgment under oath while represented by counsel that returns did not report all income subject to tax establishes taxpayer's underpayment); *Kaufman v. Commissioner*, T.C. Memo. 2003-262, 2003 WL 22078659, at *4 (holding that admissions resulting from failure to reply to answer are sufficient to meet Commissioner's burden of proving fraudulent intent and underpayment of tax).

Respondent has carried his burden of proving that the Fabians underpaid their income tax for each year at issue by overstating their income tax withholding for the year. That gives rise to a rebuttable presumption that the whole of the underpayment for the year is due to fraud. *See* § 6663(a) and (b). A taxpayer may rebut the presumption by proving by a ponderance of the evidence the portion of the underpayment not attributable to fraud. *See, e.g.*, § 6663(b); *Hobart v. Commissioner*, T.C. Memo. 1995-517, 1995 WL 634442, at *5. Petitioner has not attempted to do that, but, at trial, he tried to show that, for 2002 and 2004, respondent erred in determining the amounts Maximus actually withheld. The larger that amount, the smaller the underpayment.

**[\*40]**    2.    *Amounts of Income Tax Actually Withheld*

a.    *Introduction*

The following table compares the amounts the Fabians reported as income tax withheld with the amounts reported to the SSA as having been withheld and paid to the IRS for the corresponding year.

| Table 5 | | | |
|---|---|---|---|
| Year | Amount reported on return | Amount reported to SSA as having been withheld and paid to IRS | Difference |
| 2002 | $46,425 | $11,424 | $35,001 |
| 2003 | 46,000 | 13,969 | 32,031 |
| 2004 | 504,000 | 28,984 | 475,016 |

Respondent accepted the amounts reported to the SSA as having been withheld from petitioner's wages as actually having been withheld from his wages.  He did not accept that any additional amounts had been withheld.  For each year, respondent made a negative adjustment to the Fabians' claimed credit for income tax withheld equal to the difference between the amount claimed and the amount reported by the SSA and treated the adjustment as contributing to or, for 2002, establishing an underpayment in tax.  *See Feller*, 135 T.C. at 503; Treas. Reg. § 1.6664-2(g) (example 3).

b.    *2002*

Because petitioner admitted in the plea agreement that, on the Fabians' 2002 return, he overstated the amount of income tax that had been withheld, we give no weight to the $46,425 reported on that return as the amount of income tax that Maximus (or anybody else) actually withheld from compensation paid to him.

At trial, petitioner tried to show that the amounts Maximus actually withheld exceeded the $11,424 reported withheld to the SSA.  To support that claim, petitioner proffered three exhibits: The first was a 2002 Form W–2 purportedly from Maximus reporting amounts in agreement with what Maximus reported to the SSA, viz, wages of $289,853 and withheld income tax of $11,424.  We received the exhibit without objection.  Petitioner's second exhibit also purported to be a 2002 Form W–2 from Maximus.  It shows wages of $52,692 and federal

[*41] income tax withheld of $3,230.  Respondent objected to the second Form W–2 as excludible hearsay.  We allowed it into evidence for the limited purpose that one might find from it that petitioner had received it from Maximus but not to prove the truth of matters asserted therein, viz, the amounts of wages paid and tax withheld.  *See* Fed. R. Evid. 801(c)(2).  Petitioner's third exhibit was a purported pay stub that he claimed he had received from Maximus for the pay period ending November 30, 2002.  The exhibit shows, for the first 11 months of the year, gross pay of $281,336 and federal tax withholding of $61,376.  Respondent objected, and, as with petitioner's second exhibit, we received it into evidence for the limited purpose that one might find from it that petitioner had received it from Maximus but not to prove the truth of matters asserted therein, viz, the amounts of gross pay and withholding.

We have no need to consider whether petitioner received the two exhibits from Maximus, and, considering the exhibits for no other purpose, the record is bare of any admissible evidence of an amount actually withheld by Maximus in excess of the $11,424 reported as received by the SSA.  Petitioner has failed to prove actual withholding for 2002 in excess of $11,424, and we find that to be the amount of income tax actually withheld for 2002.

### c.  *2003*

As with 2002, because of petitioner's admission of overstating withholding on the Fabians' 2003 return, we give no weight to the $46,000 reported on that return as the amount of income tax that Maximus (or anybody else) actually withheld from compensation paid to him.  The Form W–2 that accompanied that return agrees with the amounts reported to the IRS.  Petitioner has failed to prove actual withholding for 2003 in excess of the $13,969 Maximus reported to the SSA, and we find that to be the amount of income tax actually withheld for 2003.

### d.  *2004*

Respondent's records show that petitioner filed an amended 2004 return on January 9, 2006.  The parties did not stipulate a copy of that return.  At trial we received without objection an unsigned copy of a Form 1040X, Amended U.S. Individual Income Tax Return, for 2004 (2004 Form 1040X).  In pertinent part, the 2004 Form 1040X reports a reduction in wages, salaries, tips, etc. of $1,652,000, resulting in a

[*42] corrected amount of $343,750, a reduction in total tax (before credits) of $470,741, resulting in a corrected amount of $60,370, and a reduction of federal income tax withheld by $460,000 (from $504,000 to $44,000), which, along with a credit for excess Social Security of $5,450, and an estimated tax penalty of $155, reduced the amount shown as owing the government to $11,075 ($60,370 − 44,000 − 5,450 + 155 = $11,075). Although the return reports that amount as due, it is unclear whether respondent processed the return because respondent's records do not show any additional assessment of tax. The Form W–2 for CMATI that accompanied the 2004 Form 1040 that the Fabians filed in December 2005 reports compensation paid of $171,875 and federal income tax withheld of $22,000. On the 2004 Form 1040X, petitioner explains that the reason for the amended return is: "W–2 for CMAT International incorrectly reported loan proceeds as income."

We are not sure for what purpose petitioner wants us to consider the 2004 Form 1040X. A tax return is not evidence of the truth of the statements in it. *E.g.*, *Hale v. Commissioner*, T.C. Memo. 2010-229, 2010 WL 4120880, at *2. It does not persuade us that we have erred in redetermining the deficiencies in tax determined by respondent; and, because it reports less tax due before credits ($$60,370) than on the 2004 Form 1040 ($531,111), were we to credit its report of tax due it would seemingly *increase* petitioner's underpayment of tax and the resulting underpayment penalty. *See* Treas. Reg. § 1.6664-2(a). And the corrected amount of income tax withheld reported on the 2004 Form 1040X, $44,000, differs both from the amount of 2004 income tax reported to the SSA as withheld by Maximus, $6,984, and the amount reported on the 2004 Form 4852 as withheld by Maximus, i.e., $22,000. The coincidence between the amounts reported on that form and on the now disavowed 2004 Form W–2 from CMATI leads us to question the accuracy of the former, and the huge reduction—$460,000—in petitioner's claim of income tax withheld for 2004 leads us to the conclusion that we have no reliable basis for concluding that the amount of income tax withheld for 2004 was any greater than the amount reported to the SSA for the year, $28,984, and we so hold.

e.     *Conclusion*

The amounts of income tax actually withheld for the years at issue are as determined by respondent and set forth in Table 5 as amounts reported received by the SSA.

**[\*43]** C.    *Burden of Production*

For each of the years at issue, respondent has shown both fraudulent intent to evade tax and an underpayment of tax. He has thus made the prima facie case required by section 7491(c) that imposition of the section 6663 fraud penalty is appropriate. Respondent has produced an IRS Penalty Approval Form prepared by RA Hicks and signed by Mr. Hansen, her immediate supervisor, that we find would satisfy section 6751(b)(1) but possibly for the fact that the heading of the form refers to tax year 2006 rather than the years at issue. We must determine whether the error in the heading precludes our making that finding. We think not. The body of the form speaks exclusively of 2002, 2003, and 2004 as the years for which approval is being sought. We assume that Mr. Hansen did not notice the error in the heading, or he would have brought it to RA Hicks's attention. The form's signature block states that he is approving the penalties identified on the form. We take his signature as evidence that he read the body of the form and was approving fraud penalties pursuant to RA Hicks's request on the first page of the form that "§ 6663 should be asserted to the TP [petitioner] for the significant misstatements on the 2002, 2003, and 2004 forms 1040." Petitioner makes no mention on brief of the error on the approval form. We consider it a scrivener's error that we can ignore. *See Sells v. Commissioner*, T.C. Memo. 2021-12, at \*9 (holding misdescription of penalty on approval form a "scrivener's error" and accepting Commissioner's clarification). Respondent has shown that the written supervisory approval requirement of section 6751(b) is satisfied. He has carried the burden imposed on him by section 7491(c) to show that imposition of the section 6663 fraud penalty for each year at issue is appropriate.

D.    *Reasonable Cause*

A taxpayer may avoid the section 6663(a) penalty by showing that he had reasonable cause for a portion of the underpayment and that he acted in good faith with respect to that portion. § 6664(c)(1). The decision as to whether the taxpayer acted with reasonable cause and in good faith depends upon all the pertinent facts and circumstances. Treas. Reg. § 1.6664-4(b)(1). Avoidance of a penalty by such a showing is an affirmative defense for which the taxpayer bears the burden of proof. *See, e.g.*, *Hall v. Commissioner*, T.C. Memo. 2014-16, at \*9.

**[\*44]** Petitioner did not address this defense at trial or on brief except for a single sentence in his opening brief stating that he "took tax positions that were reasonable and consistent with law and guidelines in existence at that time [apparently the time he filed the returns for the years at issue]." Moreover, the record does not otherwise reflect that petitioner acted with reasonable cause and in good faith. Petitioner has failed to show for any of the years at issue that he had reasonable cause for any portion of the underpayment and that he acted in good faith with respect to that portion.

### E.    *Conclusion*

Respondent has by clear and convincing evidence shown that the Fabians both underpaid their 2002, 2003, and 2004 tax liabilities and that, with respect to those underpayments, petitioner acted with fraudulent intent. The fraud penalty applies to the entirety of the underpayments for those years.

## V.    *Section 6651(a)(1) Additions to Tax*

Section 6651(a)(1) imposes an addition to tax for failure to file a timely tax return. The addition equals 5% of the amount required to be shown as tax on the delinquent return for each month or fraction thereof during which the return remains delinquent, up to a maximum addition of 25% for returns more than four months delinquent. *Id.* The addition to tax does not apply if the failure to file timely is due to reasonable cause and not to willful neglect. *Id.*

On April 15, 2004, petitioner filed a request for an extension of time to file the Fabians' 2003 income tax return until August 15, 2004. The Fabians filed the 2003 Form 1040 on February 13, 2005, which was almost six months after it was due. The Fabians' 2004 Form 1040 was due on April 15, 2005, and they filed it on December 27, 2005. Petitioner makes no argument that the Fabians' failure to file the two returns timely was due to reasonable cause and not willful neglect. Thus, we will sustain the section 6651(a)(1) additions to tax for 2003 and 2004.

To reflect the foregoing,

*Decision will be entered under Rule 155.*